A10A0169. WILSON et al. v. OBSTETRICS & GYNECOLOGY OF ATLANTA, P.C. et al.

(696 SE2d 339)

BLACKBURN, Judge.

Lise Wilson and her husband, Kent Lindsey ("the Parents"), individually and as the natural parents of their minor daughter Karah Alena Lindsey, filed this medical malpractice action against Obstetrics & Gynecology of Atlanta, P.C. ("OB/GYN of Atlanta"), Dixie Lee Hare, and Northside Hospital, Inc. ("Northside") (collectively, "the Defendants"), asserting that the Defendants' negligence during Ms. Wilson's labor and delivery of Karah on January 28 and 29, 2001 resulted in a prolapsed umbilical cord that caused Karah to suffer brain damage and, consequently, cerebral palsy. In the claims asserted on their behalf, the Parents sought to recover only the medical expenses they incurred for their daughter during the two years immediately preceding the lawsuit, as well as future medical expenses that will be incurred for their daughter during her minority.[1] The trial court granted the Defendants' motions for summary judgment on the Parents' claims, finding that they were time-barred by the statute of limitation and the ultimate statute of repose applicable to medical malpractice actions.

The Parents now appeal from that order, arguing: (1) that the trial court ignored evidence demonstrating the existence of a genuine issue of fact as to whether the Defendants had deliberately concealed their medical negligence and therefore the cause of Karah's injuries, and noting that such fraud would toll the statute of limitation and estop the Defendants from asserting the statute of repose; (2) that the trial court erred by implicitly holding that the right to recover medical expenses incurred on behalf of a minor child

---

[1] The medical malpractice claims asserted on behalf of the minor daughter are not at issue on this appeal.

may be asserted solely by the child's parents, and not by the child herself; and (3) that, as a matter of public policy, the statute of limitation found in OCGA § 9-3-73 (b), and which governs a minor's malpractice claim for medical negligence occurring before the minor's fifth birthday, should also apply to parents' claims for medical expenses incurred on behalf of that minor as a result of such medical negligence. We find that the trial court failed to properly consider the evidence presented at the hearing below in favor of the Parents, the non-movants, as required by Georgia law, and that such evidence is sufficient to create a jury question on the issue of whether the Defendants deliberately misrepresented and withheld information concerning Karah's birth and, if so, whether such fraud tolls the statute of limitation and estops the application of the statute of repose consistent with this opinion. Accordingly, we reverse the trial court's grant of summary judgment.

"On appeal from a grant of summary judgment, we conduct a de novo review of the evidence to determine if there exists a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, entitle the movant to judgment as a matter of law." (Punctuation omitted.) *Bone v. The Children's Place*.[2]

Viewed in the light most favorable to the Parents, the record shows that throughout her pregnancy, the mother was a patient at OB/GYN of Atlanta and that Hare was a certified nurse-midwife employed by that practice. On January 28, 2001, approximately two-and-a-half weeks before her due date, the mother's water broke while she was attending a breast feeding class at Northside. She called OB/GYN of Atlanta's answering service and Hare returned her call. After questioning the mother, Hare elected not to tell her to go to Northside's labor and delivery department for an exam, because she was not in active labor (i.e., she was not experiencing regular contractions). Instead, without examination, or knowledge of the baby's presentation, Hare instructed the mother to go home and return to the hospital "around midnight." The mother returned home and her contractions started as she pulled into the driveway. As she was instructed, the mother returned to Northside at approximately midnight and was admitted.

On her admission to the hospital, the mother was given a vaginal exam by the labor and delivery nurse, an employee of Northside, who noted that the baby's station was "high" and who placed a question mark in the box where she was to note the baby's presentation (position). Neither the nurse, or any other medical personnel made

---

[2] *Bone v. The Children's Place*, 297 Ga. App. 367 (677 SE2d 404) (2009).

an effort to determine the baby's actual position at the time. At approximately 12:45 a.m., the fetal heart monitor recorded the first episode of Karah's fetal heart rate deceleration.

The nurse paged Hare twice and eventually spoke with her at approximately 1:35 a.m. Hare instructed the nurse to give the mother Cervidil, a drug whose purpose is to facilitate labor by dilating the cervix. Hare further ordered that the mother be started on Pictocin, to induce full labor, at 7:00 a.m. Hare testified that before giving these instructions she did not ask the nurse about the baby's presentation, although she acknowledged that such information would have been "important to know," given that neither Cervidil nor Pictocin is appropriate where the baby is in a breech position. Hare assumed that the baby was in a vertex (head-down) position, explaining that if the labor and delivery nurse had suspected otherwise, "she would have conveyed that to me." The nurse apparently did not know the baby's presentation given the question mark she included on the form.

The nurse administered Cervidil to the mother at 1:45 a.m. and four minutes later Karah experienced a second recorded episode of fetal heart rate deceleration. The nurse noted the same on the mother's chart, and further noted that she would wait to notify Hare of the same notwithstanding the baby's poor condition. Shortly thereafter, Karah experienced a third recorded episode of fetal heart rate deceleration. At 3:00 a.m., with the baby's presentation still undetermined by anyone, the labor and delivery nurse again noted that she would wait to notify Hare of these episodes. Sometime between 3:30 and 4:00 a.m., however, the nurse paged Hare and informed her of the fetal heart rate variations. Approximately one-half hour later, the nurse told the father that Hare was coming to the hospital, because the baby's vital signs were showing "a lot of variability and irregularity."

Hare arrived at the hospital sometime after 4:00 a.m. and performed a vaginal exam on the mother at approximately 4:30 a.m. Suspecting that the baby was in a breech position, Hare ordered an ultrasound, which confirmed her suspicions. She did not order an ultrasound earlier when the presentation also was not known. She then ordered a non-emergency c-section and advised that she would call a physician, approximately 11 hours after first being contacted. At 4:26 a.m., the baby suffered a significant deceleration in fetal heart rate and a prolapse of the umbilical cord. Hare discovered the prolapse after conducting another examination of the mother when she could not detect a fetal heart tone. She then ordered an emergency c-section, paging any available obstetrician. The mother's condition was such that Hare rode with the mother on her gurney to the operating room, with her hand inside the mother's vagina,

attempting to hold up the prolapsed umbilical cord. For a 33-minute period beginning at 4:36 a.m., there was no recorded fetal heart rate for Karah, although Hare testified that she could feel the fetal heart rate through the umbilical cord.

At the time of her delivery at 5:09 a.m., Karah was clinically dead and had to be resuscitated. Specifically, at birth, Karah had an APGAR score of zero, which meant that she had no movement or muscle tone, no pulse, no breathing rate, and no reflexive responses, and she had a bluish-gray skin tone. Karah, who weighed almost seven pounds at birth, subsequently spent 12 days in Northside's neonatal intensive care unit.

Following her birth, Karah began treatment with both a developmental pediatrician and a regular pediatrician. After Karah began missing developmental milestones expected of a normal two-year-old, the developmental pediatrician ordered an MRI, which was performed on December 6, 2002. That MRI showed significant damage to the portion of Karah's brain that controls motor skills, and the pediatrician opined that this damage resulted from oxygen deprivation, sometime before Karah's birth. Karah was eventually diagnosed with ataxic cerebral palsy in March 2004, at the age of three years and two months.

The Parents filed suit in January 2008, just before Karah's seventh birthday. Eleven months later, the Defendants filed motions to dismiss the Parents' claims, asserting that they were barred by the two-year statute of limitation and the ultimate five-year statute of repose applicable to medical malpractice actions. The Parents then filed an amended and restated complaint, clarifying that they were not seeking compensatory damages, but instead were seeking to recover only those medical expenses incurred on behalf of Karah for the two years preceding the lawsuit and continuing during their daughter's minority. The Parents further alleged that the statute of limitation was tolled by the Defendants' fraud and that this fraud estopped the Defendants from asserting the statute of repose.

In support of their fraud allegation, the Parents assert that they were never told that the baby's presentation had not been determined upon the mother's admission to the hospital, of the episodes of fetal heart rate deceleration that had occurred during labor and delivery, or of the 33-minute gap before delivery where no fetal heart rate was recorded. Instead, they were told that Karah's "prematurity" and her breech presentation were caused by the mother's bicornated, or heart-shaped uterus, a congenital abnormality that had previously been undetected. Additionally, immediately after Karah's birth, Hare told the Parents that arterial blood taken from the umbilical cord showed good oxygenation, meaning that the baby had not been deprived of oxygen for too long.

YALE LAW LIBRARY

Hare's statements to the Parents appeared to be supported by the medical records the Parents received in response to a request made by an attorney they consulted with in or around 2003. Those initial records contained what purported to be all of Karah's arterial blood gas results from her time in Northside's neonatal intensive care unit. While these records should have been complete, they omitted the results of the first lab tests, taken 50 minutes following Karah's birth. This omission was discovered during the current litigation when, in response to formal discovery requests, Defendant Northside produced a log of all arterial blood gas results, including the previously missing result. The Northside records, however, omitted the time stamp showing when each sample was taken, making it impossible to track the tests. When the Parents' attorneys noted the omission, they followed up with specifically worded supplemental discovery, following which Northside finally provided the missing information, which proved the oxygen difficulties. The Parents contend that the omission was intentional and are entitled to such view as the non-movants. Northside's production of the complete documents, for the first time, that allowed the Parents to determine Karah's initial blood gas readings, taken 50 minutes after she was born, showed that she was severely depleted of oxygen at the time of her birth, contrary to the direct representations of Hare.

The Defendants responded to the Parents' amended complaint by filing answers thereto and by filing original discovery and converting their motions to dismiss into motions for summary judgment. Following a hearing, the trial court issued a one-paragraph order, summarily granting the Defendants' motions and finding that the Parents' claims were time-barred, because the record contained "no evidence of fraud . . . to toll the statute of limitations and estop the statute of repose." The Parents now appeal from that order.

1. The record shows that the deposition of Hare, including the exhibits thereto, was cited and discussed before the trial court during the hearing on the motions for summary judgment. The deposition and exhibits, however, were not actually filed with the trial court until after it had issued its order granting the summary judgment motions. Additionally, although copies of the redacted and unredacted documents showing Karah's blood gas results were cited to the trial court during the hearing below, they were not formally filed with the clerk.[3] The Defendants therefore argue that this Court may not consider Hare's deposition, the exhibits thereto, or any argu-

---

[3] At oral argument in this Court, however, counsel for the Parents stated that copies of those blood gas results were given to the trial judge at the hearing.

ment concerning the blood gas studies, even though they are part of the record on appeal. We disagree. See *Snipes v. Housing Auth. of DeKalb County*.[4]

In *Snipes*, this Court held that because "the parties before the trial court relied upon the depositions in their briefs in the trial court, then it must be inferred that the trial court relied upon such citation to such depositions *made either by brief or oral argument* as if the depositions were filed and opened in deciding such motions." (Emphasis supplied.) Supra, 250 Ga. App. at 771. We further inferred "that the trial court considered such depositions in rendering its judgments, although not properly filed with the trial court clerk." Id. at 772. Because of this oversight, we "remand[ed] the case for the trial judge to in fact reconsider the motions with the filed copies of the depositions as if filed at the time that the motions were filed. Thus, we vacate[d] and remand[ed] with direction that such depositions be considered." (Citation omitted.) Id.

Where the evidence in question is sufficient to create a jury question on the issue of whether the Defendants engaged in fraud sufficient to deter and debar the Parents from bringing suit within the applicable statute of limitation, so is the undisputed evidence of the labor and delivery nurse in failing to promptly deal with the distressed fetus. Therefore, we reverse the trial court's grant of summary judgment.

2. Under the applicable statute of limitation, a medical malpractice claim must be filed "within two years after the date on which an injury ... arising from a negligent or wrongful act or omission occurred." OCGA § 9-3-71 (a). That Code section also contains an ultimate statute of repose for medical malpractice claims, which provides that "in no event may an action for medical malpractice be brought more than five years after the date on which the negligent or wrongful act or omission occurred." OCGA § 9-3-71 (b). OCGA § 9-3-96, however, provides that the statute of limitation shall be tolled "[i]f the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action. . . ." In such cases, "the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." OCGA § 9-3-96. Moreover, while "[b]y definition, a statute of ultimate repose cannot be 'tolled,' " a defendant will be equitably estopped from asserting the same where the plaintiff shows fraud sufficient to toll the statute of limitation. *Osburn v. Goldman*.[5]

---

[4] *Snipes v. Housing Auth. of DeKalb County*, 250 Ga. App. 771, 771-772 (552 SE2d 133) (2001).

[5] *Osburn v. Goldman*, 269 Ga. App. 303, 303-304 (1) (a) (603 SE2d 695) (2004).

In their first enumeration of error, the Parents argue that the trial court erred in finding that the evidence did not raise a jury question as to whether the Defendants engaged in fraud sufficient to toll the statute of limitation and estop them from asserting the statute of repose. We agree.

> Such fraud that will toll the statute of limitation requires: (1) actual fraud involving moral turpitude on the part of the defendant; (2) the fraud must conceal the cause of action from the plaintiff, thereby debarring or deterring the knowing of the cause of action; and (3) the plaintiff must have exercised reasonable diligence to discover the cause of action, notwithstanding the failure to discover within the statute of limitation.

*Miller v. Kitchens*.[6] "Where a confidential doctor-patient relationship exists, such fraud may be constructive, and silence when there is a duty to speak can constitute fraud." *Kane v. Shoup*.[7] See also *Lasoya v. Sunay*[8] (the physician-patient relationship is a confidential relationship that requires disclosure of facts that would give rise to a cause of action, and the intentional failure to do so is concealment that tolls the statute). "The question of the existence of such fraud, and the related question of the patient's exercise of diligence in discovering the injury and the fraudulent concealment, are ordinarily for jury determination." *Zechmann v. Thigpen*.[9]

Here, the evidence of fraud relied upon by the Parents includes instances both of silence and of affirmative misrepresentations. Specifically, that evidence includes the Defendants' failure to disclose: (i) the fact that no one determined the baby's position before labor-inducing drugs were administered to the mother; (ii) the recorded episodes of Karah's fetal heart rate deceleration in the presence of Northside employees, without prompt action; and (iii) the fact that no fetal heart rate was detected and/or recorded for the 33 minutes prior to Karah's birth. See *Kane*, supra, 260 Ga. App. at 726 (2) ("a physician has a fiduciary duty to inform his patient of any injury or negligent mistreatment"); *Charter Peachford Behavioral Health System v. Kohout*[10] (a patient "has the right to rely upon what her physician tells her") (physical precedent only). Additionally, the

---

[6] *Miller v. Kitchens*, 251 Ga. App. 225, 226 (a) (553 SE2d 300) (2001).

[7] *Kane v. Shoup*, 260 Ga. App. 723, 726 (2) (580 SE2d 555) (2003).

[8] *Lasoya v. Sunay*, 193 Ga. App. 814, 816 (1) (389 SE2d 339) (1989).

[9] *Zechmann v. Thigpen*, 210 Ga. App. 726, 730 (5) (437 SE2d 475) (1993).

[10] *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. 452, 459 (c) (504 SE2d 514) (1998).

record shows that Hare and OB/GYN Atlanta affirmatively misrepresented that the tests on the baby's umbilical cord showed that she was relatively well-oxygenated at birth and Northside, who performed the tests, failed to provide them to the Parents. And, by producing blood gas test results that omitted and/or redacted certain information, Northside also misrepresented Karah's oxygen level at birth.

Our conclusion that this evidence is sufficient to create a jury question on the issue of fraud is supported by this Court's decision in *Bynum v. Gregory*.[11] In that case, the plaintiff alleged that an obstetrician's negligence in delivering her daughter approximately 18 years earlier had resulted in the daughter being deprived of oxygen before birth and, consequently, brain damaged. Although the physicians had originally suspected that the baby had spinal meningitis, tests ruled out that diagnosis within 36 hours after the child was born. That fact, however, was not communicated to the mother; instead, the obstetrician affirmatively misrepresented to the mother that the cause of the daughter's problems was spinal meningitis and that, as a result, the child would suffer developmental delays. Given this diagnosis from the obstetrician, the mother never asked the child's subsequent treating physicians about the cause of her developmental problems. It was not until she sought emergency medical treatment for the child, some 15 years after her birth, that the mother learned the child had never suffered from any form of meningitis and was told that "whatever happened to her [daughter] happened in the last few minutes before her birth." 215 Ga. App. at 433. The mother filed suit within two years of receiving this diagnosis.

In *Bynum*, the trial court granted summary judgment in favor of the defendant-physicians, finding that the mother's action was barred by the statute of repose. This Court reversed, finding that a jury question existed as to whether the physician's fraud had deterred and debarred the mother from seeking a further diagnosis of her child's condition and from making a further inquiry into its etiology.

Similar circumstances exist here, because there is evidence of fraud by the Defendants that may have prevented the Parents from realizing that Karah's oxygen deprivation and the resulting brain damage resulted from medical error. Also, none of the Defendants have met their duty in disclosing the true conditions of the fetus's birth. The Parents were led to believe that Karah's breech presentation and cord prolapse resulted from the mother's bicornate

---

[11] *Bynum v. Gregory*, 215 Ga. App. 431 (450 SE2d 840) (1994).

uterus. Moreover, a jury could determine that the Parents reasonably relied upon the misrepresentations of their medical fiduciary concerning Karah's "stormy birthing process." Accordingly, as in *Bynum*, it is for the jury to decide whether the statute of limitation should be tolled.

3. "Under OCGA § 19-7-2, parents are responsible for medical expenses incurred in the treatment of their minor children. Because parents have this responsibility, the right to recover damages for medical expenses incurred in such treatment is vested exclusively in a minor child's parents." (Citations omitted.) *Southern Guar. Ins. Co. v. Sinclair*.[12] On appeal, the Parents argue that, despite this long-recognized legal rule, the right to recover medical expenses incurred on behalf of a child during his or her minority does not vest *exclusively* in the child's parents.

In making their argument on this issue, the Parents cite to a line of cases holding that an emancipated minor could bring an action for his or her own medical expenses. They then cite to the Georgia Code section that provides that parental power may be lost by failure to provide necessaries for a child (see OCGA § 19-7-1 (b) (3)), and reason that "Georgia law can operate to emancipate a child when the parent cannot provide the necessaries required by the child." Here, because the Parents "have always alleged that the necessary expenses required by Karah's cerebral palsy are above and beyond what [they] could afford," the law should view Karah as emancipated for purposes of this lawsuit.

This Court, however, has previously considered and rejected this very argument, reasoning:

> Contrary to plaintiff's assertions, the instances in which the courts have on occasion allowed minors to sue for medical expenses do not amount to a disavowal of this rule [that the cause of action belongs to the parents] or a declaration that filing such a suit is an action which, in and of itself, can bootstrap the minor into "emancipation," thus validating the suit. See *Shinall v. Henderson,* 123 Ga. App. 169 (1) (179 SE2d 677) (1971); *Brown v. Seaboard Air Line R. Co.,* 91 Ga. App. 35 (84 SE2d 707) (1954); and, *Coleman v. Dublin Coca-Cola &c. Co.,* 47 Ga. App. 369, 372 (3) (a) (170 SE 549) (1933). Under Georgia law, emancipation can only arise under the terms of OCGA § 19-7-1. See *Hicks v. Fulton County DFACS,* 155 Ga. App. 1, 2 (270 SE2d 254) (1980).

---

[12] *Southern Guaranty Ins. Co. v. Sinclair*, 228 Ga. App. 386, 387 (491 SE2d 843) (1997).

Since none of the conditions precedent to emancipation in OCGA § 19-7-1 (b) has been met in the case sub judice, nor can it reasonably be claimed that under the particular allegations of the case sub judice the plaintiff minor can ever be acknowledged as emancipated by his parents, the act of filing a suit to recover medical expenses cannot be said to have emancipated the plaintiff minor child in the case sub judice.

*Rose v. Hamilton Medical Center.*[13]

The same rationale applies here. As the Parents conceded at oral argument, there is no evidence in the record that they have emancipated Karah. Thus, the right to recover the medical expenses incurred on behalf of Karah during her minority remains vested in the Parents.

4. OCGA § 9-3-73 (b) provides, in relevant part: ". . . A minor who has not attained the age of five years shall have two years from the date of such minor's fifth birthday within which to bring a medical malpractice action if the cause of action arose before such minor attained the age of five years." The Parents assert that we should "harmonize" this provision with the statute of limitation found in OCGA § 9-3-71. Specifically, they argue that claims for a minor's medical expenses should be subject to the statute of limitation found in OCGA § 9-3-73 (b) if the underlying injuries are (as here) subject to that limitations period. The record reflects, however, that this argument was neither raised in nor argued before the trial court. Accordingly, we cannot consider it on appeal. See *Miller*, supra, 251 Ga. App. at 227 (b) ("[t]his Court will not consider issues raised for the first time on appeal").

Appellee Northside Hospital's motion to file supplemental brief filed April 27, 2010 and amended motion to file supplemental brief filed May 6, 2010 are both denied.

*Judgment reversed. Smith, P. J., and Adams, J., concur.*

DECIDED MAY 21, 2010 —
RECONSIDERATIONS DENIED JUNE 4, 2010 — ▮

*John R. Bevis*, for appellants.

---

[13] *Rose v. Hamilton Medical Center*, 184 Ga. App. 182, 183 (361 SE2d 1) (1987) (physical precedent only).

310

*Sommers, Scrudder & Bass, Patricia M. Anagnostakis, Trisha L. Godsey, R. Keith Whitesides, Huff, Powell & Bailey, Daniel J. Huff, Julye M. Johns*, for appellees.